187 So. 248

**LEGG v. STATE.**

**8 Div. 758.**

Court of Appeals of Alabama.

March 7, 1939.

Watts & White, of Huntsville, for appellant.

462

Thos. S. Lawson, Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment charged defendant, appellant here, with the offense of burglary, specifically, that with intent to steal he broke into and entered the smokehouse of Charlie Hampton, where goods, wares, or merchandise, things of value, were kept for use, sale or deposit, etc.

When first arraigned upon the foregoing indictment, the defendant interposed his plea of not guilty. However, before entering upon the trial, the court granted defendant's motion to be allowed to withdraw his plea in order to permit defendant to file demurrers to the indictment. Demurrers were accordingly filed, and upon consideration by the court were overruled. This action of the court, as to ruling on demurrers, is here assigned as error.

The gist of the demurrer is, that inasmuch as the indictment avers the building to be a smokehouse, it should also have averred that it was within the curtilage of the dwelling house of the alleged injured party. That this insistence is untenable, and cannot be sustained, is clearly apparent, under authority of the case of Pressley v. State, 111 Ala. 34, 20 So. 647, where the Supreme Court held directly to the contrary.

Upon the trial of this case, in the court below, the corpus delicti was proven by the evidence without dispute or conflict. The defendant strenuously insists that the State failed to offer testimony sufficient, under the required rule, to connect this appellant with the commission of the offense. This is the controlling question presented here for consideration.

Charlie Hampton, the alleged injured party, among other things, testified: "I have a smokehouse at my place and there is just a hallway six or eight feet wide between my house and the smokehouse. The house and smokehouse are in the same enclosure, in Madison County, Alabama. The smokehouse was broken into on April 12, this year. It was prized open with an ax. I had the window nailed down. They prized the bottom plank off of the house and then raised the window. I kept meat, lard, flour and meal, and my general things, which were of value, in the smokehouse. These articles were in there at the time the smokehouse was broken into. After the smokehouse was broken into, two hams were missing. I had only two hams. Nothing else was taken. * * * The hams were taken between 9:30, 10:00 or 10:30; that is the time my wife went home to cook dinner and missed these hams. I missed them on the 12th of April, and got them back on the 13th of April. I knew the hams from the way I dressed them and packed them down. I put some marks on them and these marks were on the hams the morning I found them in the store. I was in the smokehouse that morning at breakfast. That was about sunrise. I had locked the smokehouse myself. I saw John Legg and a negro by the name of Norman Russell, I think, around my smokehouse, that morning. This man, John Legg, is about the stature of one of the men I saw there. When I first saw these men they were going in the back gate. That was 20 or 25 yards from the smokehouse. I also saw them after that. They came to the lower side of the smokehouse and stopped, and the smaller of the two came through my yard and went through the gate toward the garden. He stayed there 10 or 15 minutes. I did not see anybody actually break into the smokehouse. I never knew the defendant John Legg before that time. I did not know where he lived at that time."

Pearl Hampton, wife of Charlie, testified to the same facts that her husband

did. Charlie Hampton also testified, "I got these hams back. They were at Mr. Womack's store on West Holmes Street when I found them."

The said Mr. Womack testified as follows: "I am a merchant and run a store on West Holmes Street in Huntsville, Alabama. Sometime in April, this year, I bought some hams that were later identified by Charlie Hampton. I bought the hams from two fellows, Vernon Russell and John Legg. John Legg came into the store and asked me if I bought country hams, and I told him I did and he said he had a buddy that had two he wanted to sell. He said that he was down the street, and would be in there in a few minutes. In a few minutes, the negro by the name of Russell came in with the hams. Legg never left the store from the time he spoke to me about buying the hams until Russell came in. I paid Russell for the hams. Legg was present when I paid for them. I paid $7.75 I think for these two hams. Charlie Hampton came to my store the next day after I had bought the hams. I told Hampton that I had bought some hams and showed him the two hams."

John Legg, defendant, testified as a witness in his own behalf; among other things he stated: "I am the defendant. I did not break into Charlie Hampton's smokehouse. Nobody in my presence broke into his smokehouse. I never entered the smokehouse of Charlie Hampton, nor did anybody in my presence enter it. I have no information about anybody breaking into that smokehouse, or taking any meat from it. I know of Norman Russell and have known him about two years. I have not been intimate with him, nor have I run with him. * * * I saw Norman Russell on the 12th day of April, 1938, about a block and a half from Mr. Womack's store. I know Mr. Womack. I have been buying groceries off and on from him for five years. When I saw Norman Russell, he was on the sidewalk in front of a boarding house. I walked probably fifty or 75 feet beyond him and he called me and asked me if I was going to Mr. Womack's store, and I told him I was going there, to get some meal. He told me to ask them if they wanted to buy some country hams. I went on to the store. When I got there, I asked Mr. Womack if he bought country hams, and

he said yes. I told him that I did not have any hams but a man was coming on so he said who had some to sell. I did not tell him I had a buddy who had some hams to sell. Norman Russell came in the store in about 5 or 10 minutes after that. When he came in, I was talking to Mr. Womack. I had ordered a peck of meal before Norman Russell came into the store. Russell had a sack on his back with two hams in it when he came into the store. I paid some attention to the hams when he took them out of the sack. Mr. Womack and I both walked around and looked at the hams. I did not look for any marks on them. Mr. Womack bought the hams. He paid Russell for the hams. Russell told Mr. Womack to give me $1.50 in trade. Russell owed me $1.50 that I had loaned him some time ago. I was working at that time at odd jobs. Mr. Womack gave me $1.50 in merchandise. That was all I got out of the money. I did not sell the hams to Mr. Womack. Mr. Womack paid $7.75 for the hams. I did not see Russell before on that day before I saw him on West Holmes Street when I passed him going to Womack's store."

From the foregoing quoted testimony it is clearly apparent that a conflict appeared in the material questions involved upon this trial. This conflict made a question for the jury to determine, and rendered inapt the general affirmative charge requested by defendant. Therefore, the court properly held it was without authority to direct a verdict.

As to the action of the court in overruling defendant's motion for a new trial we are unable to put the court to error. There was nothing new offered to sustain said motion. It appears that the motion was submitted upon the testimony offered upon the main trial only. As stated, the testimony adduced upon the main trial presented a jury question. We are of the opinion that the evidence was ample to support the verdict of the jury and to sustain the judgment of conviction pronounced and entered.

The record is regular in all things, and no reversible error appearing in any of the court's rulings, it follows that the judgment of conviction from which this appeal was taken must stand affirmed.

Affirmed.